Good morning. Before you start, I understand the counsel and the clerk have negotiated the times. We have. On the appellant side of the case, I will be taking ten minutes at the outset. Mr. Wormsworth, who represents the intervenors, will take five minutes, and then we will split the remaining five minutes of her buck. Thank you, sir. You represent the EPA, right? Yes. My name is Robert Lundman. I'm a police in the court, and I represent the EPA. The district court here has ordered EPA to publish an Affluent Limitation Guideline for the construction industry. It did so without even considering the merits of EPA's decision not to so promulgate and the administrative record supporting that decision. In so holding, the district court committed three errors. First, the district court held that it had jurisdiction under Clean Water Act Section 505, and that's incorrect. This court has inclusive Let's go to that to start with. To me, that's the linchpin of much of this. Congress was obviously upset when it passed 304M. It wanted some regulations promulgated. It set some guidelines. Where in that statute is the EPA given the authority to withdraw findings once they have been entered? Do you find anything like that? Well, there's nothing in 304M, and this is more to the merits than to our jurisdiction. I understand, but it kind of gets back. It is, you're right, all related. There's nothing in 304M that either mandates promulgation of guidelines in this circumstance nor expressly grants EPA the authority to withdraw them. Okay, so that's my reading as well. There's no express authority to do it. If you can do what you've done in this situation, wouldn't the authority have the ability to withdraw proposed findings that would lead to regulations in almost any of the areas covered by 304M? It would have changed its mind. I just want to be clear here that here the agency did not withdraw a final rule promulgation. I understand that. It analyzed three separate options and ultimately chose option three, which was this. But before it did that, it did something more. It included? It listed a point source category, and it had a lot of findings. It seemed to me it was like 1999, 1998, something like that, and again in 2002. It wasn't until 2004, correct me if my dates are wrong, that you got to this three-option discussion. Well, in 2000, it put forth a Section 304 plan, and in that plan it included the construction industry. In 2002, it proposed three separate options for the construction industry. Okay, so that was 2002. And after two more years of study in 2004, EPA chose option three. Again, I get back to the point, which I think ultimately gets back to the jurisdictional issue. If there's nothing in 304M that gave the EPA the authority to come up with its three-pronged approach that varied from the 19, was it 1998 or 1999 when the point? It was in 2000 that it listed the, it published the 2000 plan. I don't know where I got the 1998, but something happened in 1998, I think. But anyway, so let's say 2000. The point source category was listed. There was a considerable amount of data that was included there that indicated that these types of effluents specifically included large amounts of toxic pollutants and other such findings. Now, you come along in 2002 and you say, no, that's not really accurate. We're going to look at three different approaches, and finally you select the last one, which is not to do anything because you feel the state and other regulatory bodies are going to take care of this. If you are allowed to do that with respect to this, why wouldn't you be allowed to do that with respect to every other mandated action covered by 304M? Well, there are a few different responses to this. I think all of them are critical. First, 304M simply does not mandate the promulgation of an effluent limitation guideline for any category that's listed. That is left to the agency's discretion to determine. We've traced through the language in our brief, and I'm happy to go through it now. It requires a plan. It requires a schedule. EPA fulfilled its duties here. It put the category in the plan. It met its schedule, and its ultimate decision here was not to put forth additional limitations. Now, that doesn't mean EPA approved nothing. It approved concrete limitations on what industry participants can do. It approved the continued reliance on the permit program. It reviewed and analyzed how states and local jurisdictions treat this. And the cumulative effect of all those programs is that there are limits on stormwater discharges from construction sites. But did it promulgate regulations, enforceable regulations in this area? It did not promulgate a new enforceable regulation for the construction industry. There's no doubt about that. And the agency's position that 304M does not require that once the 2,000 findings, for example, had been made. Right. That's exactly our position, that what Congress mandated in Section 304 is a planning process that the agency took very seriously here and went through, which is what industry categories should receive these guidelines. And there's no doubt in 1987 that Congress was upset with EPA about the pace of that assessment, and that's why it mandated EPA do this on a schedule. It's also critical, and this is a critical comparison, 304M. If you look at the language of 304M from the 1987 amendments, and that's the plan and schedule language I was talking about, and you compare it to Section 301F, which is set forth in our brief, that is a very direct EPA promulgate guidelines, you shall do it in these circumstances. And it's a very direct congressional order to EPA to promulgate guidelines. 304M doesn't look like that. Well, it does say that such guidelines shall be no later published, no later than three years after the publication of the plan, which is the plan in this case that was enacted in 2000. Later changed, but it does say, it says shall. It says shall, but it says shall, first you shall issue a plan, and second you shall establish a schedule, and that schedule shall set forth that the guidelines should be published within three years. It doesn't say, it just never directly says, EPA, you have to promulgate guidelines. And that lack of clarity means there's no clear-cut duty here to trigger a section, to support a Section 505 mandatory visa. So from the agency's perspective, basically if any, if the EPA decides that it doesn't want to do anything, 304M has no teeth. Well, no, it requires the agency to do something along the lines of what it did here, which is. It's a study, but it's not required to promulgate any regulations. At the end of the day, EPA can make the same decision it made here, which is guidelines do not make sense for this industry. And our point is, that decision should be what's reviewed in this court. EPA did not stick its head in the sand. It did not refuse to do anything here and analyze this. It issued a decision, and it issued a thorough one. And what we think plaintiffs are trying to do is by ignoring that decision and using a mandatory duty suit to get around it, to require EPA to go forward, regardless of the merits of what EPA did, is what's odd here. Is it still your contention that the district court did not have jurisdiction over this? It should have gone right to the Court of Appeals? Right. That's our first argument. That's our main argument. How do you square the new Children's Earth found case, which contains language that says, The Circuit Court's exclusive jurisdiction extends only to a substantive review of the appropriateness of the guidelines actually promulgated and not to the threshold question of whether the statutory requirements of the CWA have been met. Our Children's Earth did not address the situation we have here. It addressed a suit that was seeking to compel EPA to revise the way it was promulgating effluent limitations and guidelines. It was not seeking, as here, to effectively reverse an EPA decision on the merits, a decision that both may have not have resulted in a published final regulation, but as we've argued in our brief, approved effluent limitation or other limitation. And that's the critical language of 509B1E, the exclusive jurisdictional provision for the Court of Appeals. Can you help us understand what the logic would be of requiring, you know, what Congress, why they would want this to go to the Court of Appeals and bypass the district court? I think there's a few really important reasons why Congress would want that to happen. The main one is because the review here should be of what EPA did, which is analyze the situation and make a determination that guidelines here don't make sense given the state programs, given the permit programs, given the fact that the rules were in flux and EPA wanted more time to assess. Is this a pure record review of what happened at the agency or would there be any fact-finding that would have to be done at the district court that would? Well, we think it should be in the Court of Appeals by way of a petition for review, supported by the full administrative record that either the district court analyzed nor is for this court here. So we think the proper forum is here. The proper administrative review was EPA's action that it actually took here, arbitrary and capricious, rather than. Is the delisting, is the delisting that took place in, what was it, 2004? Right. Was that in the administrative record before the. I'm not sure. The administrative record here supported and may have ended at the time of EPA's decision when it showed up. If it came straight to the Court of Appeals, that kind of additional fact would not be in front of the Court of Appeals. Well, the Court of Appeals could take notice of the Federal Register notice. You're putting us in the fact-finding. I guess we would not say you would put us, but we would then be in the position of going beyond the record and considering new evidence. It's the same review that if this was in the district court and then appealed, it would be de novo review of the district court's administrative record. But, I mean, you would have the court, one court or the other, take notice of the fact that there was a delisting, but we would not really get into, there wouldn't be testimony or anything, certainly not before us, about why it was delisted. Was it delisted to avoid having to meet the regulations, or was it delisted because the science had evolved? What we think should happen is the Court of Appeals should assess EPA's decision not to promulgate, not to publish a finally fluent limitation guideline based on the administrative record that EPA put together to support that decision. And that's the typical APA arbitrary and capricious review. It wouldn't require testimony or fact-finding. It's what this court does when it reviews a decision from a district court, or what this court does directly in a petition for review of agency action cases. If you're right, oh, isn't it? If you're correct, then I suppose we should vacate the district court order, right, because it was without jurisdiction. And then what do we do? There's a pending Court of Appeals petition. There's petitions filed by both the NRDC plaintiffs and the state plaintiffs that are stayed in this court. So we would just lift the stays and let those? Lift forward, and that's the procedure EPA has said has gone. This case should go forward from the time in 2004 when it made its decision. It said you should petition for review in the Court of Appeals, and we'll then assess whether our decision stands or not. But that's the path to review it. There is a path. Let's assume for a moment that we have a new scenario. Let's assume that the administrator simply said, what they did in 2000 was just wrong. I don't agree with it. We're not doing anything. And then these folks bring their lawsuit. Would you still make the argument that the Court of Appeals had exclusive jurisdiction to review the matter? So you're saying instead of what EPA did here, rather there was a? They just didn't do anything. They just said, the administrator said, you know. It just stopped, or nothing happened, or it stopped. I don't care what we did before. We're not doing this. This is just wrong. Well, that would be, I think that would then not fall under 509B1E because you need an action approving. Okay, he writes it out. He writes a one-page article, and he says, you know, I've walked a lot of sites, and I don't see any stuff here. And I just don't see this. I think it's a waste of money for industry and so on. And so I've decided that we're not going to do this, period. Well, then we're getting close to the possibility in the Court of Appeals. I would imagine in that scenario, Plaintiffs would be quite happy to bring an arbitrary and capricious claim based on a one-page administrator decision without administrator explaining it. But for purposes of jurisdiction, it would be the agency's position that that would still belong in the Court of Appeals. Well, I'm not sure I'd have to confer with the agency about that. That's getting, if there's nothing, then it should be in the district court. If there's agency inaction, and that's what trustee? What if you have something in between? Well, then it's close to the line. And I think here we're pretty far onto the other line, where there's a published decision in the Federal Register. There's an administrative record covering shelves in Washington just waiting for a judicial review that has not yet received. And before EPA's decision here, based on that record, should be essentially reversed by this court. This court should be reviewing that administrative record in the State Petitions for Review. So that's how we think that it should play out. Thanks. Good morning. May it please the Court, my name is Jeff Longsworth. On behalf of the interviewer, defendant, appellants, Associated General Contractors of America, National Association of Homebuilders, Judge Smith, I think part of the issue that I want to talk about goes directly to some of your initial questions about 304 and the findings under 304 going back to 2000. In fact, this industry was put on the 304M list in the year 2000, based on a consent decree with the National Resource Defense Council and EPA. That's identified in the State's brief at 12. And what we have is we have a consent decree leading no factual finding. There's no determination that this industry discharges toxic and nonconventional pollutants at that point. There are a lot of old documents for other rulemakings. There's a lot of innuendo and accusation about urban runoff, nonpoint source runoff, post-construction runoff, uncontrolled runoff from urban development, NRDC at 11, and a whole host of other allegations. But what we're talking about is an industry that's strictly regulated under 40 CFR 12226B10 and B15. And this is a narrow set of a heavily regulated industry. I have a question for you. The materials to which you make reference came out of the consent decree. Are those part, from your perspective, of the administrative record that would be reviewed by the court of appeal, if the court of appeal had exclusive jurisdiction? Those documents are not part of the consent decree. Those are other rulemakings EPA was undertaking that the plaintiffs have borrowed just to try to allege toxic and nonconventional pollutants. I understand. My question is whether that would be part of the administrative record that the court of appeal would be reviewing, if it were the exclusive arbiter, if you will, of this question. The administrative record is extensive. EPA researched the industry, and I would guess. But that's the 2002 work. I'm asking whether the material from 2000, however it got there, would be part of the record. There is nothing in the 2000 notice, the 304M plan, that lists this industry at the beginning, that talks about the pollutants or the industry as a whole. It just lists them on a list. That's all the 2000 plan does. But I think the 2002 record docket for this rulemaking would include all of that past research relevant to this industry, because EPA goes back through all of this. I'm not sure I'm understanding you. It is or is not included in the record, the 2000 findings and the materials in that? I believe that they would be. I don't know the record perfectly, but I believe they would be. Okay. So we have an industry which is heavily regulated, that has very specific types of discharges, which were already permitted through the NPDES program on a national basis. And we're looking at whether, in fact, 304M requires additional regulation. And yet there's been no finding of toxic and nonconventional pollutants from this industry. And the plain reading of 304 says you list and then you promulgate based on a presence of toxic and nonconventional pollutants. And yet EPA in its final action on this four-year notice and comment rulemaking concluded that, in fact, they don't have toxic and nonconventional pollutants, rendering the judgment of the district court and the injunction essentially contrary to Congress's intent here under 304M. Isn't the jurisdictional issue really a question of whether the administrator has failed to perform, and I'm reading here, any act or duty under this chapter which is not discretionary with the administrator? I think that there is a jurisdictional issue between the 505 and 509 claim. And I think that is ‑‑ I believe that that claim is helped to be resolved by what is the action that we're looking at. And what we're looking at is a notice and comment rulemaking with a complete administrative record. And for that purpose, it falls under 509. If you look at the cases ‑‑ But don't we go back, though, don't we go back, though, to 304M? If 304M did not exist, then I think your point is pretty clear. But if 304M has any meaning, then we have to determine whether that provides or establishes a duty on the part of the administrator of the EPA to do something with respect to certain regulations. You have a preexisting finding, whatever their source, in 2000. I realize it's the agency and the industry's position that having looked at those previous findings that there was, after study, inadequate bases for going forward with regulations. But it still gets back to the fact, does it not, whether 304M says, whether you like it or not, given the fact that you've got these findings in 2000, you've got to go forward and promulgate regulations. Is that the question, really, here, in terms of jurisdiction? The question is whether 304M says that you have to move forward regardless of earlier findings. And it's our position that 304M doesn't say that. And consistent with the Our Children's Earth case, where this court looked at what the statutory mandate said, and said, as long as you meet the statutory mandates, if there are other areas in which you can make decisions, that's up to EPA's discretion. And Congress clearly laid that out for EPA to make that discretion. And this is an area to determine, and Our Children's Earth says that, as to whether toxic and nonconventional pollutants exist, which is the sole basis of regulating under 304M, then that's up to EPA's discretion, and that's an easy determination to make. Thank you very much. Thank you. Good morning. Good morning, Your Honor. I'm Richard Deering from the state athletes. On the question of jurisdiction, the key case, as Your Honor pointed out, is Our Children's Earth, and it makes this very simple. This is what it says. So long as the plaintiff's claim relates to acts or omissions as to which there is a nondiscretionary duty under the Clean Water Act, it is a citizen suit. If the acts or omissions are discretionary, it is not a citizen suit. In that case, it may be in the district court, it may be in the court of appeals, depending whether it falls into the very narrow language of 509B1. But this case clearly is of the first sort. It alleges only one thing, or the claim that's on appeal as to which partial summary judgment was granted alleges only one thing. It's that EPA has no discretion under the Clean Water Act to fail to promulgate regulations. And for purposes of our decision, we have to take the complaint on its face. Isn't that correct? Exactly, Your Honor. The statute 505A2 says where there is alleged a failure by the administrator to perform a nondiscretionary duty. That's the allegation in Claim 1 of the complaint. And that's a nondiscretionary duty claim. It's a citizen suit. Our children's earth makes that clear. The only kinds of claims as to which, and let me back up one second on that point, all of this talk about an administrative record, as a result of that claim, all of this talk about an administrative record is irrelevant. The only thing that's relevant is, A, whether the Clean Water Act imposes that duty, and, B, something that's undisputed here, whether EPA has promulgated those guidelines. Everyone agrees they haven't. Those are the only two issues. The administrative record has no relevance to that claim, and that's why all this discussion of review of an administrative record is really a red herring in this case. I'd like to move briefly to the merits of the 304M question. Your Honor is exactly right. 304M, when Congress enacted that statute, it was upset. It was upset because guidelines hadn't been promulgated the way they should have been. And Congress said explicitly in the legislative history, we're frustrated by the slow pace. That statute was enacted to solve a problem, which was EPA's failure to promulgate guidelines. A reading of the statute that says all Congress wanted was a schedule, they didn't want actual guidelines, makes no sense. Can you help me understand why they can't delist? I mean, if they decide that this industry is no longer or shouldn't have been put on the list, why can't they take it off the list? Well, it's an interesting question. In Congress, there's no explicit authority to delist. The more important thing here, however, is not whether they have authority to delist, but whether they didn't. In reality, they never actually delisted. What they did in 2004, and this is something that on appeal has been distorted somewhat, what they did in 2004 is they said this. We are not identifying the category in our 2004 plan. This is in the section of the 2004 plan which identified new categories for rulemaking. But whether they were identifying the category again in 2004 has no legal consequence. They've identified it in 2001 under 304M, identification is a one-time act. That's what starts your three-year clock running. If you identify it again later, you don't get two more years. You don't get the three-year clock extended. It's the first identification that matters. That's what the district court held, and he was correct on that point. And in context, when they made that statement in 2004 where they said we're not identifying it, that was in this context. They had already concluded a final action on their rulemaking, which in EPA's view and EPA's mistaken view, in our view, in our determination, that all they needed to do was take final action to satisfy, essentially, their obligations as a result of the 2000 identification. So you're saying the second list doesn't supersede the first? To say we're not identifying it in a later list is not relevant when they've identified it previously. Okay, suppose they said this list replaces the previous list and the previous list is revoked or something. That would be getting closer, Your Honor. That's not what they said. That would be getting closer. And there's a critical second point, which is even under the EPA's cases, the cases that talk about some background authority, which we think in the context of this statute where affirmative action was required, this background authority to reconsider really has no application. But if you take their own cases on face value, what their cases say is an agency has authority to reconsider, provided they give somebody notice of their intent to do so. Here we would say this. Not only did they not ever say that they were revoking the prior list, superseding it, they didn't say anything that suggests an act that would have legal effect as delisting. But they never said we're considering delisting. We invite your notice and comment. We're considering delisting because, in our view, or because we're not certain whether the statutory criteria are met and we invite public comment on that point. They never said that. Do they have to do that in the first instance to list it? 304M2 says explicitly the plan must be subjected to public review and comment. There's an explicit public review and comment requirement for 304M guidelines plan. So to make sure I'm clear, your view is that they have to do the same formality to delist it, if they can delist it, that they did to put it on the list to begin with. Exactly. The same formality. And that's what their cases say also. You have to give someone notice of your intent. And so not only did they say we're considering revoking, they didn't ultimately say we revoke. There's been no delisting here. So the question of their authority is a question that's better left for another case. It was never done here. Just to talk about this issue. Let me just interrupt for just one second. The 2000 listing was done with the appropriate formalities? The 2000 listing was they published notice on the listing. I don't know that no one's ever objected to that listing on the ground of improper notice. So they did publish a proposed plan. They had a final plan. The key in 2004, and this is the other interesting thing, and it dovetails with the idea that what they were saying in 2004 is we're not identifying again. It's because in the proposed plan in 2004, all that was said about construction and development was there is a rulemaking underway for construction and development. That's it. They come back in April of that year and say we've concluded our rulemaking. We're not promulgating regs. In our view, that inaction violates their nondiscretionary duty under the Clean Water Act. They come along five months later in late August and say in their 2004 plan we're not identifying construction. We're not going to consider again whether this is an appropriately listed category. And I'd also point out 2004, if you read that section where that statement is made, the upshot of that statement, there's a long prefatory analysis of the identification process. The conclusion of that section is EPA is identifying two new categories for rulemaking under 304M. There was airport de-icing and water treatment. So the whole context of that section is the new categories they're identifying. But in the case of construction and development, it doesn't matter because they already identified it. Obviously, you folks need to know where to sue. I mean, you need to know whether you go to district court or court of appeals, and I imagine that's more important than anything else is so you know where to file your complaint. But is there any reason why it's advantageous to you to go to district court first? It would seem like it just slows things down if you've got a legitimate gripe. Is there some reason why it would be better for you to go to district court first? Or do you really care? I don't think so. I think it's clearly, though, what the Clean Water Act requires here. This is a citizen suit. It belongs in district court. This is the issue. You know, one issue with citizen suits and nondiscretionary duty claims is that there could be factual disputes that need to be resolved by the district court. Here, this is why we won on summary judgment. There happens to be none because EPA, it's undisputed they didn't issue these regs. And the only question, it's a pure legal question whether the Clean Water Act requires them to do so. You know, that's like any summary judgment case. Really, at the end of the day, it could have been filed first in the court of appeals. And so I think as a practical matter, it's a pure legal issue in this case. I think in terms of what Congress had in mind, maybe Congress wanted people who have legitimate gripes about what the agency did to bypass the district court, get to the court of appeals, and get a legitimate grievance rectified. But 509B1, which is the statute under the Clean Water Act that grants jurisdiction to the court of appeals, original jurisdiction of the court of appeals, is very narrow. It identifies only very specific types of actions under the Clean Water Act as to which petitions for review can be filed. So there's a whole host, in fact, of potential claims under the Clean Water Act that involve discretionary actions. And this is what Our Children's Earth says. Just because it doesn't fall under 505A2 doesn't mean that it's necessarily in 509B1 because that statute is so narrow. So that might be true under other statutes that have very broad jurisdictional provisions. But the Clean Water Act is not that kind of statute. And, in fact, it's only a very small subset of claims that can be filed first in the court of appeals here. So it's not this case in particular, but you can envision other cases of this general sort that would require fact-finding that would? Fact-finding as to whether EPA did. Fact-finding at a minimum the question whether EPA did or did not do X. If the allegation is that X is required as a nondiscretionary matter by the Clean Water Act. Wouldn't that be a matter of record that wouldn't require testimony? I don't believe so because the question here, the only thing that matters, you know, there are potentially a broad array of nondiscretionary duty claims that could be made. And I don't think it's always a matter of record whether EPA did or did not do the act. If EPA, as they did here, doesn't dispute that they didn't do it, then I think there is no fact-finding that needs to be done. But it doesn't change the fact that 505A2 is very explicit in its jurisdictional language. This Court in Trustees for Alaska said if you're trying to compete, if the claim is that EPA failed to issue an affluent limitation guideline that the Clean Water Act required it to issue, that's a citizen suit. In Our Children's Earth, the Court said so long as the claim involves acts or omissions that are nondiscretionary with the administrator, that's a citizen suit. That's this claim. And so it's a 505A2 claim and it's a citizen suit in the district court. Thank you very much. Thank you. Good morning. Good morning. May it please the Court. I'm Melanie Shepardson for Plaintiff Appellee's Natural Resources Defense Council and Waterkeeper Alliance. And here with me at the council table is Lane Friedrich with Waterkeeper Alliance. And she's available to answer any specific questions that the Court may have about waterkeeper standing. Thank you. I'd like to just quickly address the last question that Judge Silverman asked about whether there's any advantage in being in the district court. And the simple answer to that is that yes, there is, because the district court can award injunctive relief. In this case, the district court did just that. It ordered the EPA to promulgate ethyl limitation guidelines and resource performance standards for the construction and development industry. I'd like to also respond to Mr. Longworth's discussion about that there's no evidence that there are discharges of toxic and nonconventional pollutants from the construction and development industry. And in the excerpt of record, I believe that Judge Smith was referring to a 1999 ethyl limitation guideline plan update and notice of proposed rulemaking, which stated that construction site runoff can contribute high loadings of nutrients and metals to receiving streams. And there's also a 2002 environmental assessment that discusses the number of toxic pollutants that are discharged from metals like lead and chromium and selenium and polyaromatic hydrocarbons. Those would all be part of the 2000 listing administrative record, right? Well, the 2002 environmental assessment would not be part of the 2000 listing because it came out in 2002. But it would be part of the rulemaking record, the administrative record in this. But it went up to 2004, obviously, if you're reviewing the agency's decision up to that point. I guess what I'm trying to get a hold of here is part of what we have to do is, of course, to decide whether there's a duty under 304N. And part of that is going to require us to determine what the agency did prior to the 2002 action that they took and what was in the record, what findings had been made and so on. In other words, whether they had already gone down the road in complying with 304M when that happened. Can you help me and us as to what you believe the agency had done to comply with 304M with respect to this particular industry? What would we find in the record? Where would we find it in the record? Well, I believe that the action that you're referring to, or it's what EPA says is an action anyway, was their withdrawal in 2004. So those documents that I referenced from the 1999 ELG plan update and the environmental assessment from 2002 are certainly in the administrative record, would be in the administrative record for that. For the 2004 action. That's correct, if there is any actual action there. I'd also like to mention that there are a number of other things in the legislative history that support our view that there's a mandatory duty here. For example, there's this Senate report 9950 from 1985, which specifically says that any non-trivial discharges from sources in a What's the site on that? It's Senate report number 99-50 from 1985, and that's also in the excerpts of record. And EPA's arguments are just at odds with the statute and congressional intent. EPA was trying to solve, or Congress was trying to solve a problem when it added section 304M to the Clean Water Act in 1987. EPA can't just rely on permits that are issued on a case-by-case basis to set limits. Congress viewed these baseline standards as essential to preventing a race to the bottom where you have various states trying to lure industry into operating in their state by having lax pollution standards. So, counsel, what case law supports your argument that the EPA cannot rely on regulations by the states in fulfilling its obligation under the Clean Water Act? Well, there's actually the EI DuPont and Emerson Company v. Train case by the Supreme Court said that limits are to be based on classes and categories. It must be set by regulation, and in that case, industry had challenged EPA's obligation. By federal regulation, it says that the EPA cannot rely on the state's regulation at all. Does that case say that? That case says that as long as there's an opportunity to have a variance in some particular case, but that otherwise it's section 301B that specifically refers to developing effluent limitations for classes and categories of point sources. But under the Clean Water Act, you're saying that this case says that the EPA must promulgate national regulations? This case said that EPA is not supposed to be developing effluent limitations on a permit-by-permit basis, that they're supposed to be done by regulation. So what are you looking at? Okay. It's pages 116 through 117. Right. I've read that, but it doesn't preclude the EPA from allowing the states to regulate, does it? Well, it says that effluent limits are supposed to be established by regulation for classes and categories of sources. And this, for the most part, the states issue permits, and the, you know, what EPA says is that the EPA is not supposed to do that, but what EPA is pushing for here is to have the states issue permits that include effluent limits on a case-by-case basis. Right. And 116 and 117 say that the administrator is to publish guidance and guidelines. So why would that preclude the states from actually issuing the permits under those guidelines? Because the guidelines are what are at issue in this case. The way that the Clean Water Act works is that EPA is supposed to set effluent limitation guidelines that are the pollution control standards for a particular industry. And then those guidelines are translated into effluent limits for individual permits. What EPA is pushing to happen in this case is to omit that first step of coming up with the national baseline standards, the effluent limitation guidelines for a particular industry, and just jumping to step two, which would be setting effluent limits in each permit on a permit-by-permit basis. Does that answer your question? Somewhat. And Section 402A1 of the Clean Water Act also reveals that effluent limitations and permits that are based on a permit-by-permit basis were only meant to be an interim measure because Congress had this preferred approach of having national baseline standards and there's a House report that also reiterates that, that it's supposed to be, it was intended to be done on, as an interim basis and basically because Congress wanted to get on with the business of reducing pollution, issuing permits so that point sources could be reducing their pollution. And so they didn't want to hold up the process while EPA tickered around with setting the national baseline standards for different categories of pollution. I'm just wondering, as you suggested a little while ago, if somebody could go build houses in one state versus another state and that the burden on the house builder in one state would be entirely different than that in another state based upon the sophistication of the regulation in the home state involved. Well, the declarations submitted by NRDC members in support of standing demonstrate that in the personal experience of the House experts, who are also members of NRDC, that they've seen this firsthand, that in different areas of the country you have widely varying requirements to control pollution from this industry, and that in places where there are really good measures, that the streams are cleaner than in places where the measures are very lax. And that's what Congress was concerned about right there. Well, isn't that a measure of enforcement as well? Because you can still have divergence in the states and states and states depending on how stringently whatever guidelines are promulgated are enforced. So how does that, you know, how does that change if you're still relying on the states to enforce whatever guidelines are promulgated? I see that I'm out of time. Can I answer your question? Go ahead. Please answer. Okay. Well, if you don't have the standards to begin with, then you're not going to have anybody voluntarily using particular control standards. It's state to state, depending on how stringent the enforcement is. You could have some variance, but without having the initial prophylactic measure of requiring facilities to incorporate pollution control measures to begin with, then it's their potentially subject to enforcement action. Industries that have permits that are in place are likely to make sure that they comply with those measures. I understand. Thank you. I have a few points. I'd like to start off with what you were just talking about right now. I think it's critical that these uniformity concerns, the race to the bottom concerns, does what EPA did here to boil it down, makes sense, should be heard. But they're not, they weren't heard by the district court here. The administrative record wasn't analyzed by the district court. And the administrative record is not parked in this case. It's parked in the state petitions for review lodged somewhere else in this building or somewhere else in the Ninth Circuit. And that's where those issues can be assessed. And NRDC can make its arguments that uniformity is important. We need uniformity. We have a very precise decision on the record here that uniformity cannot be achieved in these circumstances. But those issues just haven't been joined yet. And those are the issues that should be joined to determine whether EPA's action stands or not. Mr. Gearing said that the industry was not really delisted. And furthermore, even if it were, they didn't dot the I's and cross the T's the way they're supposed to. I think you can only reach that result by a very, very formalistic reading of what EPA did here. EPA in 2004, when it chose option three, said we are not setting forth right now a regulation for the construction industry. That's the end game of the 2000 listing. That's the final step. You either do it or you don't. EPA says we're not doing it. We're relying on these existing limitations. I'm talking about the subsequent delisting. Subsequent to that, a few months later, EPA published its new plan. It does this every two years. And its new plan, it did not include the construction industry. That should not be a surprise to anybody, given what EPA had just said months earlier, that we're not promulgating, we're not... Those are two really different things, aren't they? I don't think so, because the listing in 2000, the result of that listing is either you end up with a published regulation that governs that industry, or you don't. And EPA had already said, the answer to that question is no, we're not going to provide one. It seems to me there's a difference between saying, you know, they're on the list, but we're going to let the states take care of it, and on the other hand, saying, well, they're not on the list anymore. There may be a slight distinction there, but the list, though, is part of the planning process that either leads to a regulation or a decision not to regulate. It's not like there's other lists, for example, that trigger ongoing EPA obligations. There are various lists in the Clean Water Act that if the water's on an impaired water list, that triggers ongoing sorts of duties, but this is not that. This is a planning regime akin to the Southern Utah Wilderness Alliance planning regime, which we talked about in our briefing. When the subsequent list came out, was that promulgated without notice and hearing, as Mr. Gearing claims? I'm not sure exactly what he's claiming. The list comes out as it's part of EPA's planning process, and Congress mandated that that planning be public to this extent. So EPA publishes its list, and then it's open for comment. But the decision, the ultimate decision here, with regard to the construction industry, was the one reached earlier in 2004, when EPA said, Option 3, we're going to rely on the existing federal permit program, we're going to rely on the state programs, and we're going to then see what happens going forward. If things change, EPA can decide that maybe it warrants listing again, and it's clear in its decision that the decision was made at the time. It was not one for all time, as I think one of the other side's briefs seems to imply. I want to be sure of one thing. 304M1B says, and I have the preamble here, that EPA must publish every two years a plan BAT. And B says identifies categories of sources discharging toxic or nonconventional pollutions for which guidelines under subsection B2 and subsection 1316 have not previously been published. Was the 2000 data intended to comply with B? I'm not sure what data you're referring to. In 2000, they listed, it's the first... The point source, where the point source listings, was that intended to comply with B, subpart B? Right, it was pursuant to B. Okay, and if you get to that, then it says, and C, establishes a schedule for promulgation under which the regulations will be, you know, the guidelines will be issued, shall be issued no later than three years. Three years after the publication. So, I guess it gets back, at least for me, you've got something that's there as part of the 304M. It was done officially. It does not seem that there was anything done officially to take it off. Do you agree with that? Well, EPA publishes these plans every two years, and it sees the plans as superseding the prior plans. But it didn't say, it's no longer... It said in 2004, both in the choice of option three and then the next plan, that the construction industry is off the plan, and then offered a summary of the explanation that related back to the decision to choose option three. So, it's not that it just, it wasn't on the plan, it was like, well, where did it go? It had the earlier decision in 2004 that explained that, and then the later in the plans. It didn't officially say, you know, pursuant to 304M, et cetera, B, subpart B. We made this decision before. It no longer is correct. B is no longer correct. We are, in effect, delisting it. B doesn't, I guess the point of EPA's interpretation of B is that it requires, it's part of the planning process, so it's the brainstorming stage of what should we look at to decide what needs to be done. 18 of 20 times, it's resulted in a guideline. This case and one other case is a very rare example where it is not. And so that's what we see as the purpose of 304M1B. Thank you very much.
judges: Silverman, Rawlinson, Smith